```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/4/2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
TAHARI MCCRAE, *on behalf of herself, FLSA Collective Plaintiffs, and the Class*,

                              Plaintiff,

        -against-

OAK STREET HEALTH, INC. AND OAK STREET
HEALTH MSO, LLC,

                            Defendants.
-------------------------------------------------------------------X

24-CV-1670 (JPO) (KHP)

**OPINION AND ORDER ON MOTION
TO COMPEL ARBITRATION**

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE:**

      Plaintiff Tahari McCrae was employed as a Medical Assistant by Defendant Oak Street Health MSO, LLC ("MSO"), a wholly-owned subsidiary of Defendant Oak Street Health, Inc. ("OSH") (collectively, the "Defendants") from February to November 2023. She alleges that while employed, she was not paid overtime as required by the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") and seeks to represent a class and collective of similarly situated employees in 25 states to recover unpaid wages, including overtime, due to time-shaving, statutory penalties, liquidated damages, and attorneys' fees and costs. Plaintiff also brings individual claims for violations of the Family and Medical Leave Act ("FMLA") and the New York State and City Human Rights Laws in connection with Defendants' alleged discrimination against her on the basis of pregnancy and denial of leave related to her pregnancy and seeks to recover economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

1

Defendants have moved to compel arbitration of the claims. For the reasons discussed below, the motion is GRANTED insofar as it will be referred to arbitration and this case will be stayed pending the conclusion of the arbitration.

## FACTUAL BACKGROUND

MSO required Plaintiff to sign an Employment Agreement (the "Agreement" or "Employment Agreement") upon hire. The Agreement contains ten numbered paragraphs and an Exhibit A, which is titled "Confidentiality, Non-Competition and Non-Solicitation Agreement." The Agreement covers the terms and conditions of Plaintiff's employment, including that she would be an at-will employee, the duties of her position as a Medical Assistant, her pay and benefits, and other obligations.

Section 5 of the Agreement specifically references Exhibit A and states that "The Employee agrees that, concurrently with the execution of this Agreement, the Employee shall enter into a Confidentiality, Non-Competition and Non-Solicitation Agreement with the Company in the form of Exhibit A hereto." Section 3 of the Agreement also specifies that Plaintiff's pay and benefits are "[i]n consideration of the services to be rendered under the Agreement, including the post-employment obligations set forth in Exhibit A."

Section 9 of the Agreement discusses Alternative Dispute Resolution. In particular, it provides:

> Employee and Employer acknowledge and agree that the Alternative Dispute Resolution described in this paragraph is a mutual condition of their employment relationship, and that both Parties had the opportunity to negotiate over the terms of this paragraph and knowingly and voluntarily agree to its terms. In consideration for Employee's employment by Employer and continued employment, Employee's receipt of compensation and other benefits from Employer, and the Employer's agreement herein to arbitrate, Employee agrees to participate in, and be bound by, the procedures set forth in this Agreement. The Parties acknowledge and agree that their mutual

forbearance of the right to proceed in court alone acts as sufficient consideration to support all of their obligations under this Alternative Dispute Resolution provision.

The Company and Employee mutually agree that, excluding the Employee's post-employment obligations as set forth in Exhibit A, any controversy or claim arising out of or relating to this Agreement or the breach thereof, or any other dispute between the parties, shall be submitted to mediation before a mutually agreeable mediator, which cost is to be borne equally by the parties hereto, except this cost may be waived by the Employer where such fees are discouraged or prohibited by applicable law. In the event the Parties fail to agree on a mediator, or mediation is unsuccessful in resolving the claim or controversy within one (1) month after the commencement of mediation, such claim or controversy shall be resolved by arbitration in Illinois under the auspices of the American Arbitration Association.[1] The costs of arbitration, including the fees and expenses of the arbitration, shall be shared equally by the parties unless otherwise required by law or directed by the arbitrator in arbitrator's award.

Notwithstanding any other provision in this Agreement, this Alternative Dispute Resolution provision does not apply to: (a) any claim by Employee for medical and disability benefits under the Workers' Compensation Act or unemployment compensation benefits under the Unemployment Insurance Act; (b) any Charge of Discrimination filed by Employee against the Company with the U.S. Equal Employment Opportunity Commission, the Illinois Department of Human Rights, the Chicago Commission on Human Relations, or charges filed with the National Labor Relations Board under the National Labor Relations Act; or (c) any claim by the Company for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets, intellectual property, unfair competition, breach of the non-solicitation covenant, or breach of the non-competition covenant. Additionally, nothing in this Alternative Dispute Resolution provision is intended to or shall prohibit, prevent, or otherwise restrict Employee or Employer from: (a) reporting any good faith allegation of unlawful employment practices to any appropriate federal, State, or local government agency; (b) reporting any good faith allegation of criminal conduct to any appropriate federal, State, or local official; (c) participating in a proceeding with any appropriate federal, State, or local government agency enforcing discrimination laws; (d) making any truthful statements or disclosures required by law, regulation, or legal process; and (e) requesting or receive confidential legal advice.

---

[1] To the extent that the arbitration provision provides that any arbitration shall be conducted under the auspices of the American Arbitration Provision ("AAA"), it suggests AAA arbitration rules apply. *See, e.g., L. Offs. of Joseph L. Manson III v. Keiko Aoki*, No. 19-CV-04392-LTS-GWG, 2020 WL 767466, at *4 (S.D.N.Y. Jan. 3, 2020) (noting that the arbitration clause invoked AAA arbitration rules by specifying that disputes arising under the agreement must be arbitrated "under the auspices of the American Arbitration Association"). Those rules contemplate that the arbitrator shall have the power to determine the scope and validity of the arbitration provision. *See* www.adr.org.

Section 10.6 of the Agreement contains a merger clause that states, "This Agreement, including the exhibits attached hereto, is intended to be the final, complete and exclusive statement regarding their subject matter, except for other agreements specifically referenced herein (including the Confidentiality, Non-Competition and Non-Solicitation Agreement to be executed concurrently with this Agreement).  Unless otherwise specifically provided for herein, this Agreement supersedes all other prior and contemporaneous agreements and statements pertaining to this subject matter, and may not be contradicted by evidence of any prior or contemporaneous statements or agreements."

Section 10.14 of the Agreement states, "The Employee agrees that any and all of the Employee's obligations under this Agreement capable of execution after the termination of the Employee's employment, including but not limited to those contained in exhibits attached hereto, shall survive the termination of employment and the termination of this Agreement."

Section 10.12 provides that the Agreement shall be construed and enforced in accordance with and governed by Illinois and federal law, as applicable to the claim(s) asserted.

Section 10.11 allows the court to sever invalid, unenforceable, or void provisions and to blue pencil provisions to give them the maximum effect permissible under law.[2]

And, in the "Employee Acknowledgment" at the end of the Agreement, just before Exhibit A, the employee "acknowledges (i) that Employee has consulted with or has had the opportunity to consult with independent counsel of Employee's own choice concerning this Agreement and has been advised to do so by the Company, and (ii) that Employee has read and understands the Agreement, is fully aware of its legal effect, and has entered into it freely

---

[2] Exhibit A also states in its Section D(1) that it is governed by Illinois law.

4

based on his own judgment.  The Employee hereby agrees that Employee's obligations set forth in Sections 5 and 6 hereof and the definitions of Proprietary Information and Inventions contained therein shall be equally applicable to Proprietary Information and Inventions relating to any work performed by the Employee for the Company prior to the execution of this Agreement."

Further, Section A(d) of Exhibit A specifically acknowledges the Employment Agreement and consideration, stating "Employee acknowledges and agrees that, pursuant to the Employment Agreement, dated as of the date hereof, by and between the Company and the Employee (the "Employment Agreement"), Employee has received good and valuable consideration including, but not limited to, benefits set forth in Paragraph 3 of the Employment Agreement, employment, and benefits and compensation set forth in Employee's offer letter and this good and valuable consideration is sufficient for Employee's agreement to abide by these post-employment restrictive covenants."  Section C(7) of Exhibit A contains similar language as Section A(d) of that same exhibit, except for containing the phrase "this non-disclosure obligation" instead of "these post-employment restrictive covenants."

Defendants sent the Employment Agreement, together with its Exhibit A, to Plaintiff to sign through DocuSign on Defendants' Human Resources Information Systems platform, which is called Workday.  (ECF No. 42, Fulurija Decl. at ¶¶ 3-4)  Plaintiff's Workday credentials were tied to her work email, which were password protected by a password created by Plaintiff.  (*Id.* at ¶ 5)  Plaintiff was required to log into Workday through her work email to access the Employment Agreement and its exhibits and sign them electronically.  (*Id.* at ¶¶ 5-6)  Defendants' records show that Plaintiff accessed Workday on February 24, 2023 at 8:23 a.m.,

5

viewed the Employment Agreement and its attachment (which were all part of a single 8-page electronic document in DocuSign), and signed the document electronically at 8:24 a.m. via Workday. (*Id.* at ¶¶ 7-11) Plaintiff was only required to sign the last page of the Employment Agreement after Exhibit A and could not have signed (or rejected) any other portions of the Employment Agreement. (ECF No. 33-2, Fulurija Decl. at ¶ 7) Contemporaneous chat records confirm that between February 23-25, 2023, Plaintiff informed Human Resources she had arrived at work and accessed Workday. (ECF No. 42, Fulurija Decl. at ¶¶ 11-12) After Plaintiff signed the Employment Agreement, a representative of the Defendants counter-signed the Agreement twice, which generated a certificate indicating that signing of the Employment Agreement had been completed. (*Id.* at ¶¶ 13-14) Completion of this task enabled Plaintiff to complete the remaining new-hire tasks, such as signing up for direct deposit and completing her I-9. (*Id.*) Plaintiff was not permitted to start working until she signed the Employment Agreement. (*Id.*)

## LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA further provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition [the court] for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. When deciding a motion to compel arbitration, courts apply a similar standard to summary judgement and consider "all relevant,

admissible evidence submitted by the parties," drawing "all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017).

The FAA directs courts, when deciding a motion to compel arbitration, to consider (1) whether the parties agreed to arbitrate; (2) the scope of the parties' agreement; (3) whether Congress intended those claims to be non-arbitrable (if implicated); and (4) whether to stay the balance of the proceedings pending arbitration if only some of the claims are arbitrable. *Espinosa v. SNAP Logistics Corp.*, 2018 WL 9563311, at *2 (S.D.N.Y. Apr. 3, 2018) (citations omitted). The question of arbitrability is presumably determined by the Court, but this presumption can be overcome upon "clear and unmistakable evidence . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (citation omitted). "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, ––– U.S. ––––, 139 S. Ct. 524, 528, 202 L.Ed.2d 480 (2019). Finally, "[w]here the scope of an arbitration agreement is ambiguous, the Federal Arbitration Act's policy favoring arbitration requires that 'any doubts be resolved in favor of arbitration.'" *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 929 (1983)) (internal alteration omitted).

The United States Supreme Court has made clear that "the FAA was designed to promote arbitration," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345-46 (2011) (quotation marks and citation omitted), and courts must "'rigorously enforce' arbitration agreements according to their terms," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013)

(citation omitted).  Still, "despite the strong federal policy favoring arbitration, arbitration remains a creature of contract." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). As a result, "before an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties." *Meyer*, 868 F.3d at 73.  This question is governed by state law principles of contract formation. *Starke*, 913 F.3d at 288.  The party moving to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010). The initial burden of showing that an agreement to arbitrate existed must be made by a preponderance of the evidence. *Fleming v. J. Crew*, 2016 WL 6208570, at *3 (S.D.N.Y. Oct. 21, 2016) (citation omitted).

      Once the court has determined that an agreement to arbitrate exists, the burden then rests on the party opposing the motion to demonstrate that the agreement is invalid or unenforceable, or that the agreement does not encompass its claims. *Aminoff & Co. LLC v. Parcel Pro, Inc.*, 2022 WL 987665, at *3 (S.D.N.Y. Apr. 1, 2022).  These issues are also governed by state law.  Under New York law, a contract that is "grossly unreasonable or unconscionable" may be found unenforceable.  *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988).

      In the absence of a genuine issue of material fact regarding the formation of the arbitration agreement, the motion to compel must be granted if the dispute falls within the scope of the arbitration agreement. *Meyer*, 868 F.3d at 74. Where a court determines it should "compel[ ] arbitration pursuant to a written agreement, both the FAA and New York law

mandate that the action be stayed pending arbitration." *Espinosa*, 2018 WL 9563311, at *6 (citing 9 U.S.C. § 3; CPLR § 7503(a)).

## DISCUSSION

Plaintiff argues that the motion to compel arbitration should be denied because: (1) the Employment Agreement containing the arbitration provision was not signed by Plaintiff, and the contract itself by virtue of its merger clause and signature blocks required it to be signed to be binding; (2) delivery of the contract alone cannot render it binding when the arbitration provision states that the parties "had the opportunity to negotiate" its terms and the contract's acknowledgements state that the employee had the opportunity to consult with counsel; (3) there was no consideration for the arbitration agreement because Defendants retained the right to terminate Plaintiff's employment at will; and (4) the arbitration agreement is unenforceable because it requires Plaintiff to bear half the costs of an arbitration and pay Defendants' attorneys' fees if she is a losing party.

Plaintiff's first two arguments go to formation of the contract; that is, whether she actually entered into the Employment Agreement. New York law governs whether the parties entered into the Employment Agreement. *Errato v. Am. Exp. Co.*, No. 18-CV-1634, 2019 WL 3997010, at *7 (D. Conn. Aug. 23, 2019) (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)). As discussed below, this Court finds that the parties did enter into the Employment Agreement and its arbitration provision.

Plaintiff's third and fourth arguments go to the enforceability of the arbitration provision in the Employment Agreement. These arguments raise the question of applicable

9

law. As discussed below, this Court finds that these issues should be resolved by the arbitrator in the arbitration proceedings referred to by this Court.

### A. Agreement to Arbitrate

The Employment Agreement calls for application of the "laws of Illinois, federal law, the Federal Arbitration Act or the Illinois Uniform Arbitration Act, whichever applies based on the claim(s) asserted." Thus, there is a question whether New York or Illinois law applies when resolving the contract-based questions raised in the motion. In diversity cases, the court typically looks to the state law in the district where the case is pending to resolve choice of law issues. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 494-97 (1941); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 153 (2d Cir. 2013). Under New York choice of law rules, the court first assesses whether there is any actual conflict of laws on the issues presented. *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

In this case, there is no conflict between Illinois and New York law on the question whether Plaintiff entered into the Employment Agreement containing the arbitration provision. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015) (noting no meaningful difference among the laws of New York, Illinois, and California regarding contract formation). Regardless, the parties agree that New York law governs whether a legally-binding contract was formed. Accordingly, the Court considers whether the parties entered into the Employment Agreement under New York law.

Under New York law, the "touchstone of contract" is "[m]utual manifestation of assent, whether by written or spoken word or by conduct." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (citation omitted). "[A] party who executes a contract is considered

bound by the terms of that contract." *Ruiz v. New Avon LLC*, 2019 WL 4601847, at *6 (S.D.N.Y. Sept. 22, 2019) (quoting *Stern v. Espeed, Inc.*, 2006 WL 2741635, at *1 (S.D.N.Y. Sept. 22, 2006)). Further, a person who signs a written contract is "conclusively presumed to know its contents and to assent to them." *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (citing *Metzger v. Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920)). It is the responsibility of the person signing a written contract to know and understand its contents. *Id.* An arbitration agreement is not rendered invalid by a failure to explain the contents of a written contract to the person signing the contract. *Id.* at 150.

Moreover, a merger clause in a written contract "acts only to require full application of the parol evidence rule to the writing in question" and does not void an arbitration agreement or require that such agreement be executed to be binding. *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005). Finally, even "an unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound." *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 124 (2d Cir. 2011) (citing *Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 369, 795 N.Y.S.2d 491, 495, 828 N.E.2d 593, 597 (2005)). An arbitration agreement in an unsigned written contract is enforceable "when it is evident that the parties intended to be bound by the contract." *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assoc.*, 845 N.E.2d 1265, 1266 (N.Y. 2006). Continuing employment after receiving notice of an arbitration agreement, even if the person does not sign the arbitration agreement, constitutes consent to the arbitration. *See Manigault v. Macy's East, LLC*, 318 F. App'x. 6, 7–8 (2d Cir. 2009).

In this case, Defendants have met their burden in showing that the parties entered into the Employment Agreement and its arbitration provision by a preponderance of the evidence. As the evidence shows, Defendants sent the Employment Agreement, together with its Exhibit A, as a single 8-page electronic document to Plaintiff to sign through DocuSign on Defendants' Human Resources Information System platform called Workday.  Plaintiff proceeded to electronically sign the documents, thereby agreeing to be bound by the arbitration provision in the Employment Agreement.  After Plaintiff signed the Employment Agreement, a representative of the Defendants counter-signed the Agreement twice, which generated a certificate indicating that signing of the Employment Agreement had been completed. Completion of this task enabled Plaintiff to complete her remaining new-hire tasks, such as signing up for direct deposit and completing her I-9.  Plaintiff was not permitted to start working until she signed the Employment Agreement.

While Plaintiff disputes the authenticity of her signature on the basis that it is her practice not to use the prefabricated signature supplied by DocuSign but, instead, to electronically sign documents with her unique signature, the record strongly supports the conclusion that Plaintiff did, in fact, electronically sign the Employment Agreement.  Plaintiff was required to log into Workday through her work email to access the Employment Agreement and its Exhibit A and sign them electronically.  Plaintiff's Workday credentials were tied to her work email, which were password-protected by a password created by Plaintiff. Defendants' records show that Plaintiff accessed Workday on February 24, 2023 at 8:23 a.m., viewed the Employment Agreement and its Exhibit A (which were all part of a single 8-page electronic document in DocuSign), and signed the document electronically at 8:24 a.m. via

12

Workday. Contemporaneous chat records confirm that it was Plaintiff who electronically signed the Employment Agreement. The chart records show that between February 23-25, 2023, Plaintiff informed Human Resources that she had arrived at work and accessed Workday. Plaintiff does not offer any persuasive evidence to suggest someone other than her signed the Employment Agreement through DocuSign.

Plaintiff also argues that she only signed and agreed to be bound by Exhibit A and points to the merger clause in the Employment Agreement and the four signature blocks (two in the Employment Agreement and two in Exhibit A) as supporting evidence. This argument is unpersuasive for several reasons. First, as noted above, the Employment Agreement and Exhibit A were sent to Plaintiff for signature as a single 8-page electronic document. Plaintiff signed the 8-page electronic document after Exhibit A, which was the only place where she could sign. In signing the written contract, Plaintiff is "conclusively presumed to know its contents and to assent to them." *Gold*, 365 F.3d at 149 (citing *Metzger*, 227 N.Y. at 416).

Second, when Plaintiff signed after Exhibit A, she expressly acknowledged the existence of the Employment Agreement and agreed to terms pursuant to that agreement. Section A(d) to Exhibit A states:

> Employee acknowledges and agrees that, pursuant to the Employment Agreement, dated as of the date hereof, by and between the Company and the Employee (the "Employment Agreement"), Employee has received good and valuable consideration including, but not limited to, benefits set forth in Paragraph 3 of the Employment Agreement, employment, and benefits and compensation set forth in Employee's offer letter and this good and valuable consideration is sufficient for Employee's agreement to abide by these postemployment restrictive covenants.

*See* Employment Agreement, Exhibit A, Section A(d). Section C(7) of Exhibit A contains similar language as Section A(d) of that same exhibit, except for containing the phrase "this non-

disclosure obligation" instead of "these post-employment restrictive covenants." At a minimum, Plaintiff had notice of the Employment Agreement containing the arbitration provision. It was Plaintiff's responsibility to know and understand the contents of the written contract. It was not Defendants' responsibility to explain the contents of the written contract to Plaintiff in order to give validity to the arbitration provision.

Third, the express title of Exhibit A indicates that this document is an exhibit. The term "exhibit" implies the existence of another document upon which the exhibit is dependent, here, the Employment Agreement. When signing after Exhibit A, Plaintiff should have known that she was assenting to both Exhibit A and the document upon which the exhibit was dependent, here, the Employment Agreement.

Finally, Plaintiff asserts that the existence of a merger clause in the Employment Agreement requires signatures by both parties in order for the arbitration agreement to be binding, but that is incorrect. As noted above, a merger clause in a written contract "acts only to require full application of the parol evidence rule to the writing in question" and does not void an arbitration agreement or require that such agreement be executed to be binding. *Bank Julius Baer & Co.*, 424 F.3d at 283. Here, however, there are three signatures (one from Plaintiff and two from Defendants), which serve as evidence that the parties intended to be bound by the Employment Agreement and its arbitration provision. Though Plaintiff disagrees with this conclusion, there is nothing to suggest that four signatures are necessary to form a binding contract. In fact, no signatures are necessary to form an enforceable contract, "provided there is objective evidence establishing that the parties intended to be bound." *10 Ellicott Square Ct. Corp.*, 634 F.3d at 124 (citing *Flores,* 4 N.Y.3d at 369, 795 N.Y.S.2d at 495, 828 N.E.2d at 597). As

noted above, the conduct of the parties shows that they intended to be bound by the Employment Agreement. Further, continuing employment after receiving notice of an arbitration agreement, even if the person does not sign the arbitration agreement, constitutes consent to the arbitration. *See Manigault*, 318 F. App'x. at 7–8. Therefore, even if Plaintiff denies having signed the Employment Agreement containing the arbitration provision, Plaintiff continued her employment with Defendants after receiving the Agreement, effectively consenting to the arbitration.

Turning to Plaintiff's second argument, it is true that delivery of a contract alone cannot render the contract binding. That, however, was not the case here. As noted above, both the Plaintiff and Defendants engaged in conduct demonstrating mutual assent, particularly by signing the Employment Agreement containing the arbitration provision through DocuSign. And at a minimum, Plaintiff continued her employment with Defendants after receiving the Employment Agreement, which constituted consent to the arbitration. That the arbitration provision states that the parties "had the opportunity to negotiate" its terms and the contract's acknowledgements state that the employee had the opportunity to consult with counsel does not change this conclusion. In signing the Employment Agreement, Plaintiff is "conclusively presumed to know its contents and to assent to them." *Gold*, 365 F.3d at 149 (citing *Metzger*, 227 N.Y. at 416). Notwithstanding, Plaintiff did nothing to communicate that she disagreed with any of the terms of the Agreement or indicate that she wished to consult with counsel, and there is nothing to suggest that Plaintiff was denied the opportunity to negotiate the contract terms or prevented from consulting with counsel.

Therefore, for the reasons above, the Court finds that an agreement to arbitrate exists.

**B. Scope of the Parties' Agreement**

As noted above, there is a "general presumption that the issue of arbitrability should be resolved by the courts," but that presumption can be overcome by "clear and unmistakable evidence . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec Corp.*, 398 F.3d at 208 (quoting Bell, 293 F.3d at 566). An example of "clear and unmistakable evidence" overcoming the presumption is the parties' choice to "incorporat[e] by reference the . . . Rules [of the American Arbitration Association]," because the AAA's rules include an instruction that arbitrators are to determine their own jurisdiction. *Id.* at 211; *see also Lismore v. Societe Generale Energy Corp.*, 2012 WL 3577833, at *5 (S.D.N.Y. Aug. 17, 2012) ("[A] party who signs a contract containing an arbitration clause and incorporating by reference the AAA rules cannot later disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability.") (internal citations and quotations omitted). Under the FAA, a court must compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648, 649 (1986) (internal citation and quotation omitted). Moreover, where "there is a legitimate dispute about the scope and applicability of the [arbitration] clause, the threshold question of arbitrability must be referred to the arbitrator." *Laumann v. N.H.L.*, 989 F. Supp. 2d 329, 338 (S.D.N.Y. 2013).

Here, the arbitration provision provides that any arbitration shall be resolved "in Illinois under the auspices of the American Arbitration Association." This raises a choice of law question between Illinois and New York law with respect to the meaning of the phrase "under

16

the auspices of the American Arbitration Association." As noted above, in diversity cases, the court typically looks to the state law in the district where the case is pending to resolve choice of law issues. *Klaxon Co.*, 313 U.S. at 494-97; *Liberty Synergistics Inc.*, 718 F.3d at 153. Under New York choice of law rules, the court first assesses whether there is any actual conflict of laws on the issues presented. *Fed. Ins. Co.*, 639 F.3d at 566.

In this case, there is no conflict between Illinois and New York law on the question of the meaning of the phrase "under the auspices of the American Arbitration Association." Both Illinois and New York law interpret that phrase to invoke the rules of the AAA, including AAA Commercial Arbitration Rule 7(a), which provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See, e.g.*, L. *Offs. of Joseph L. Manson III*, No. 19-CV-04392-LTS-GWG, 2020 WL 767466, at *4 (noting that the arbitration clause invoked AAA arbitration rules by specifying that disputes arising under the agreement must be arbitrated "under the auspices of the American Arbitration Association"); *Meimaris v. Braich*, No. 06 CIV. 7790 (LAP), 2011 WL 13128212, at *1 (S.D.N.Y. Sept. 14, 2011) (same); *Our Lady of Bellefonte Hosp. v. Ashland GI Servs., LLC*, No. 11 C 6833, 2012 WL 787199, at *1 (N.D. Ill. Mar. 9, 2012) (same); *Amgen Inc. v. Ortho Pharm. Corp.*, No. 95 C 6310, 1997 WL 232755, at *1 (N.D. Ill. May 2, 1997) (same).

Insofar as AAA Rule 7 providers that the arbitrator has the power to determine the scope and validity of the arbitration provision, and the parties have incorporated this rule into the Employment Agreement, Plaintiff's arguments regarding the enforceability of the arbitration provision here falls within the province of the arbitrator. *See Micheli & Shel, LLC v.*

*Grubhub Inc.*, 2022 WL 622828, at *5 (S.D.N.Y. Mar. 1, 2022) (finding "the contract at issue plainly delegates the question of arbitrability to the arbitrator" because of the incorporation of the Commercial Rules of the AAA in the terms); *Sollinger v. SmileDirectClub*, LLC, 2020 WL 774135, at *3 (S.D.N.Y. Feb. 18, 2020) (holding an arbitrator was to decide the issues of arbitrability where the arbitration clause provided that any arbitration "shall be resolved using the rules of the American Arbitration Association."). Thus, Plaintiff's third and fourth arguments — that there was no consideration for the arbitration agreement because Defendants retained the right to terminate Plaintiff's employment at will, and that the arbitration agreement is unenforceable because it requires Plaintiff to bear half the costs of an arbitration and pay Defendants' attorneys' fees if she is a losing party—must be decided by the arbitrator because they concern its enforceability.

### C. Staying the Action Pending Arbitration

Where a court compels arbitration pursuant to a written agreement, both the FAA and New York law mandate that the action be stayed pending arbitration, if either party so requests." *Shehadeh v. Horizon Pharma USA, Inc.*, 2021 WL 4176254, at *6 (S.D.N.Y. Sept. 14, 2021) (citing 9 U.S.C. § 3; N.Y. C.P.L.R. § 7503(a)). However, if the Court determines that it cannot compel arbitration, the Court may instead "refer[] to arbitration" and stay the litigation. *See* 9 U.S.C. § 3. Such a referral to arbitration and stay of the litigation is appropriate where, as here, the arbitration clause provides for arbitration to take place outside of this district, in Illinois. Accordingly, this Court lacks the authority to compel arbitration outside of this district. *See L. Offs. of Joseph L. Manson III*, 2020 WL 767466, at *4 (collecting cases and granting request for a stay pending arbitration where arbitration clause at issue identified Washington,

D.C. as the place of arbitration); *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 2021 WL 37691, at *6 (S.D.N.Y. Jan. 5, 2021) (referring a case to arbitration where Court determined it could not compel arbitration in New Jersey and instead staying litigation).  Therefore, this matter is referred to arbitration and stayed pending arbitration.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED insofar as the matter will be referred to arbitration and stayed pending the outcome of the same.  The parties shall provide the Court updates every 90 days on the status of the arbitration.

**SO ORDERED.**

Dated:     November 4, 2024
           New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge

19